E. C. VANDAGRIFT, Receiver, Appellant, v. MASONIC HOME OF MISSOURI.

Division One, March 29, 1912.

1. **BANKS AND BANKING: Depositors: Debtor and Creditor.** The relation of debtor and creditor subsists between a bank and its depositor. This rule is reciprocal, so that when a bank permits its customer to overdraw, he thereby becomes the debtor and the bank the creditor.

2. ————: ————: **Overdrafts: Liability of Payee.** The treasurer of a corporation had an account with a bank of which he was the president; that bank received more of the corporation's money from the original depository than was returned, and it permitted the treasurer to divert this money to his personal account and then to overdraw that account by checks

to creditors in order to replace funds of the corporation mis-appropriated by him. The corporation, meanwhile, had no knowledge of such misappropriation and the treasurer's books, frequently examined, were found to be correct. *Held*, in an action by the receiver for the bank as for money had and received, that the corporation is not liable for the unpaid balance of such overdrafts.

3. REFERENCE: Compulsory: Appeal: Review of Findings. If a case, though referred by consent, is one wherein a compulsory reference might have been ordered, the Supreme Court upon appeal will review the findings of the referee.

Appeal from St. Louis City Circuit Court.—*Hon. G. C. Hitchcock*, Judge.

AFFIRMED.

*John A. Eaton, E. H. McVey* and *Franklin Miller* for appellant.

(1) An action for money had and received, lies when one person has received money belonging to another, which, in justice and right, should be return-ed. Richardson v. Drug Co., 92 Mo. App. 515; Gaines v. Miller, 111 U. S. 395. (2) On December 22, 1905, Tygard was a defaulter in his trust as treasurer of the Masonic Home, in the sum of $19,329.14. He was insolvent. He took $17,522.88 out of the Bates National Bank and used it in paying back the Masonic Home and in paying the obligations of the Masonic Home. (3) John R. Parson was the secretary of the Masonic Home, and one of its board of directors. He was the active financial officer of the home. He had knowledge of Tygard's misuse of the home funds. He discovered the shortage while engaged in the business for which he was employed, i. e., the cashing of warrants and the making of deposits in the State National Bank. His knowledge therefore became the knowledge of the Masonic Home. Bank v. Schaumberg, 38 Mo. 244; Williams v. Dittenhorfer, 188 Mo.

144; Carroll v. Railroad, 14 Mo. App. 498. (4) Tygard's embezzlements were made possible only by reason of the neglected duty of the Masonic Home in that the Home failed to exercise even the slightest supervision over him as treasurer and failed to use even ordinary diligence in connection with its funds. (5) The moneys of the Masonic Home were so handled by Tygard in the accounts in the Bates National Bank as to make knowledge from an investigation of the account as to the condition and amount of moneys belonging to the Masonic Home impossible, and as no actual knowledge concerning the peculations and embezzlements of Tygard can be imputed to the Bates National Bank by reason of the unlawful acts of Tygard, the Bates National Bank had no constructive or actual knowledge of what was transpiring with reference to the use of its moneys for the benefit of the Masonic Home. (6) The Bates National Bank is presumed to know what its president knows only when he is acting within the scope of his agency, and his fraudulent acts to the detriment of the bank cannot charge the bank with notice. The bank is not imputed with knowledge as to the fraudulent intent of Tygard in withdrawing the funds of the Masonic Home from the fact that Tygard was merely the president of the Bates National Bank. Bank v. Slattery, 166 Mo. 620; Bank v. Froman, 129 Mo. 430; Bank v. Thayer, 184 Mo. 93; Bank v. Lovitt, 114 Mo. 525; Johnson v. Shortridge, 93 Mo. 227; Traber v. Hicks, 131 Mo. 186; Smith v. Boyd, 162 Mo. 157; Knobeloch v. Bank, 27 S. E. 962; 4 Thompson on Corporations, secs. 5205-6. (7) The moneys of the Bates National Bank, having been appropriated and used for the benefit of the Masonic Home, by its treasurer, entitles the Bates National Bank to be reimbursed in respect to all of the moneys taken from it by the defaulting treasurer and used in payment of the obligations of the Masonic Home.

Bank v. Lumber Co., 54 Mo. App. 327; Bank v. Lumber Co., 60 Mo. App. 255; Watson v. Bigelow, 47 Mo. 413; Mayor v. Ord, 57 Mo. App. 644; Bohlmann v. Rossi, 73 Mo. App. 315; Fahy v. Grocer Co., 57 Mo. App. 77; Huttig Co. v. Gitchell, 69 Mo. App. 121; Mining Co. v. Bank, 96 U. S. 640; Society v. Mitchell, 26 Mo. App. 217; Assn. v. Bank, 126 Mo. 82; Hennessy v. Bank, 129 Fed. 557; Bank v. Morgan, 96 U. S. Sup. Ct. 122; Curtin v. Mining Co., 74 Pac. 851; Clement v. Clothing Co., 68 N. W. 224; Kerwin v. Match Co., 79 Pac. 928; Parsons v. Investment Co., 64 Mo. App. 32; Trust Co. v. Loan Co., 61 N. E. 688; Capital Co. v. March, 61 Pac. 876; Phillips v. Lumber Co., 62 Pac. 749; Bank v. Hughlett, 84 Mo. App. 268. (8) ''If the treasurer of a corporation is a defaulter and his defalcation is as yet unknown and unsuspected, and he steals money from a third person and places it with the funds of a corporation, in order to conceal and make good his defalcation, and the corporation uses the money as its own, no other officer knowing any of the facts, the corporation does not thereby acquire a good title to the money as against the true owner. But the latter may maintain an action against the corporation to recover back the same.'' Newell v. Hadley, 206 Mass. 335, 29 L. R. A. (N. S.) 908; Mills v. Mills, 147 Mass. 268; Foote v. Cotting, 195 Mass. 55; Brookhouse v. Pub. Co., 73 N. H. 68; Holden v. Bank, 72 N. Y. 286; Gunster v. H. & P. Co., 181 Pa. 327; Bank v. Dunbar, 118 Ill. 625; Ditty v. Bank, 75 Fed. 769; Bank v. Thompson, 118 Fed. Rep. 802; Electric Co. v. Electric Co., 65 Fed. Rep. 344; Bank v. Munger, 95 Fed. 92; Aldrich v. Bank, 176 U. S. 618; Bank v. Kellog, 56 N. W. (S. D.) 1071; Bank v. Milling Co., 1 S. D. 388; Bannantine v. MacIver, 1 King's Bench, 103; 3 Am. & Eng. Anno. Cases 1143. (9) When Tygard repaid the money he had stolen from the defendant, by paying the Masonic Home debts with the $17,-

522.88 stolen from the plaintiff, Tygard, and Tygard alone, represented the defendant in receiving the $17,-522.88. The Masonic Home must be deemed to have known what he knew, and the Home cannot accept the benefit of his act without accepting the consequences of his knowledge. The defendant cannot obtain greater rights from his act than if it did the thing itself, knowing what he knew. Newell v. Hadley, 206 Mass. 335, 92 N. Y. Rep. 507; Mills v. Mills, 147 Mass. 269; Aldrich v. Bank, 176 U. S. 637. (10) The annual examination of Tygard's accounts as treasurer by the so-called experts was a farce. No effort was made to examine his bank account and check it up with the books. The trial court erred therefore in sustaining the findings of the referee.

*Jamison & Thomas* and *W. M. Williams* for respondent.

(1) The finding of facts by the referee stands as a special verdict. Coming here, as it does, with the approval of the trial court, the only open question as to the facts is, whether there is any evidence to support these findings. Ferry Co. v. Railroad, 73 Mo. 389; Berthold v. O'Hara, 121 Mo. 88; Tufts v. Latshaw, 172 Mo. 359. (2) There is substantial evidence to support each and every fact found by the referee and set out in his report. There was practically no dispute about the facts, and they are succinctly and clearly stated in the report. (3) "To maintain assumpsit for money had and received, plaintiffs must show that defendant has actually received his money, or prove such facts as to raise a fair presumption that he has received it." Hutchison v. Phillips, 11 Ark. 270; Larry v. Hart, 12 Ga. 422; Madison v. Wallace, 30 Ky. 98. The evidence does not tend to show that any money belonging to the Bates National Bank was ever actually received by the defendant corpora-

tion. The treasurer, Tygard, had sufficient money be-
longing to the defendant to pay every warrant drawn
on him. The part which he kept in the State National
Bank was undoubtedly so applied and enough of the
money belonging to the home to meet all other war-
rants was deposited by him in his own bank. The pre-
sumption must certainly be indulged, in the absence
of evidence to the contrary, that the money remitted
to meet these warrants was from the funds of the
home. The finding of the referee "that it has not been
shown that the defendant received any money belong-
ing to the Bates National Bank, nor has proof been
submitted to raise a fair presumption that defendant
received it," is a proper conclusion upon the evidence.
(4) Even if it had been shown that Tygard had em-
bezzled some of the money of the Bates National Bank,
and, without the knowledge of the defendant's offi-
cers and directors, had used it to pay warrants drawn
upon him as defendant's treasurer, for the payment
of which sufficient money had been previously placed
in his hands by the defendant, still plaintiff could not
recover in this action. "A payee is not bound to in-
quire into the authority of a person from whom he
receives money in payment of a debt, for a different
doctrine would be productive of great mischief." Ran-
kin v. Bank, 188 U. S. 557; Sanborn v. Bank, 115 Mo.
App. 50; Hardware Co. v. Mayer, 110 Mo. App. 14;
Hatch v. Bank, 147 N. Y. 184; Stephens v. Board, 79
Mo. App. 183; Smith v. Bank, 107 Iowa, 620. (5)
The money of the home was used for the benefit of
Tygard's bank, and not the money of the bank for
the use of the home. Many of the checks drawn against
the account of Tygard, treasurer of the home, in the
State National Bank were in favor of J. C. Clark,
cashier of the Bates National Bank, and for money
transferred to the last named bank. These transac-
tions appeared upon the books of the Bates National

Bank. Its officers and directors must be held to have knowledge of what its books show. At least two of the directors were shown to have had actual knowledge thereof, while defendant's directors had no notice whatever of the condition of these accounts.

BOND, C.—This suit is by the receiver of the insolvent Bates National Bank, located at Butler, Bates county, Missouri, against the Masonic Home of Missouri, a corporatioon created for charitable purposes, in three counts, set forth in the petition. The first two were based upon notes purporting to be signed "Masonic Home of Missouri, by F. J. Tygard, Treasurer," dated, respectively, December 25, 1905, and March 12, 1906, and for the sums of $3000 and $1500. The right to recover on these two counts of the petition was not claimed on the oral argument in this court. The only count of the petition left is the third count, which is in *assumpsit* for $17,522.88. The answer to this count of the petition is a general denial. The case was referred by consent, and the taking of testimony before the referee was concluded, and a report made by him on the 26th of September, 1906.

The facts found by the referee are, in substance, that the defendant was organized as a corporation on the 12th of October, 1886, for the purpose, as shown by it articles, "to establish and maintain a home for indigent Masons of Missouri, and for resident needy widows and orphans of deceased Masons . . . and to hold such property and conduct such business as may be necessary for the successful maintenance of said home." That following its organization of the first board of directors, F. J. Tygard was elected treasurer and was annually re-elected to that office for a period of twenty years, or until September, 1906; that during this time said Tygard was president of the plaintiff bank and its predecessor, and in each of said

banks he kept an account headed, "F. J. Tygard, Treasurer, Masonic Home of Missouri."

His duties as treasurer are defined in the by-laws of the defendant, as follows: "Sec. 3. The treasurer shall be the custodian of all moneys and securities belonging to the home, and disburse the same in payment of expenses by the direction of the board of directors, and shall not make any payment except on proper vouchers drawn by order of the board and signed by the president and secretary; submit to the board, or any member thereof, his books, papers and accounts whenever requested so to do, and to report annually to the president, and oftener if required, the financial transactions of the board of the home, and transmit to his successor in office his official effects."

Under the by-laws of the defendant, its secretary (John R. Parson and S. C. Bunn) was required to record the proceedings of the board of directors when approved, take care of the seal and perform other duties required by the board, and "to receive all moneys belonging to this corporation; he shall give receipts therefor and shall keep an accurate account thereof. Funds which may come into the hands of the secretary from any source shall be by him paid over to the treasurer . . . and he shall take the treasurer's receipt therefor." By a later by-law the treasurer was charged with the duty of paying the expenses of the defendant under direction of its board of directors, and to submit to the board his books, papers and accounts when requested, and to make annual reports to the president. The secretary was also further directed to deposit sums received by him "to the credit of the treasurer in such bank as the treasurer may designate." The treasurer was further forbidden to pay out money "except upon drafts of the president and secretary issued in pursuance of orders from the board."

The report of the referee further sets out that the grounds and buildings of defendant were purchased by contributions and donations from various Masonic orders; that its expense funds were acquired by assessments laid upon their members by local Masonic lodges throughout the State of fifty cents per head on each member; that an appropriation out of said funds was made by the various Masonic lodges and paid over to the secretary of the home, who, in turn, paid the same to F. J. Tygard, treasurer of the home, or placed it to his credit in some bank; that for some years before 1906, the secretary, under the direction of said Tygard, deposited such collections in the State National Bank of St. Louis, to-wit, "To the credit of F. J. Tygard, Treasurer of the Masonic Home;" that the treasurer used such deposits in the payment of warrants made out in proper form for the expenses of the home, or from time to time withdrew and transferred them to the Bates National Bank of Butler, Missouri, of which he was president; that he kept three separate accounts in said last named bank—one in his individual name, one as treasurer of the Masonic Home, and one as Treasurer of the Grand Commandery of Knights Templar, and used the funds in each account indiscriminately in crediting money held by him as treasurer of the home, for paying out money for the home, *as stated in plaintiff's second amended petition.* (These underlined words were the only change made in the report of the referee when it was confirmed by the court). And for credits and payments in his own account and as treasurer of the grand commandery, and in issuing checks to Tygard and Clark; and in transferring credits to a bank at Rich Hill, Missouri.

Tygard and Clark was a firm composed of Tygard, the president, and Clark, the cashier, of the Bates National Bank, engaged in making speculative

ventures and using for that purpose sometimes money belonging to the home. The Rich Hill Bank was a bank at Rich Hill, Missouri, in which Tygard was interested and of which he was vice-president; that Tygard made full and regular monthly and annual reports of the condition of his accounts as treasurer of the home to the president of its board of directors, which were fully distributed; that his books and accounts were annually, and at times oftener, forwarded to the office of the Masonic Home and examined by direction of its board of directors and compared with the books kept by the secretary; and that annually an expert accountant was employed to examine and compare reports of these two officers; that warrants for the expenses of the Masonic Home were, by the direction of the treasurer, made payable at the State National Bank of St. Louis, and, after such payments, he took credit for the same as treasurer; that in three instances in which this did not occur, the payments were made under the direction of the board and shown by receipts instead of by warrants; that the evidence adduced on the trial disclosed that when the notes referred to in the first and second counts of plaintiff's petition were executed, the treasurer, according to the showing of his books, had then on hand larger sums than were expressed in the face of said notes; and that early in September, 1906, before the plaintiff went into the hands of a receiver, the treasurer had on hand, according to his books, to the credit of the home, $1290.36; and that he paid over to his successor as treasurer this amount; that during the entire term of his incumbency as treasurer, he never attempted to create any obligation against the home or in its name other than the two promissory notes described in the petition.

"The members of the board of directors of the home knew nothing of the existence of the notes sued on until the institution of this suit;" and that there was

no authority given Tygard to create such obligations; that the evidence showed numerous instances where Tygard would use the deposits to his credit as treasurer in his own bank (the Bates National Bank) to start an account in that bank in favor of himself or others, and, subsequently, to transfer amounts to the credit of the home; that "from 1893 to 1896 he checked out of the deposits to his credit in the State National Bank of St. Louis, as treasurer of the home, more than $120,000, $80,000 of the sum being made payable to J. C. Clark, cashier of the Bates National Bank, and remainder to the cashier of the Bank at Rich Hill, Missouri;" that about one-fifth of this amount, or $24,000, when received by the Bates National Bank was properly credited to Tygard as treasurer of the Masonic Home on its books; that the remaining four-fifths, about $96,000 when so received were placed by the Bates National Bank, at the direction of Tygard, to his personal account, or to the account of Bates National Bank, or to Tygard and Clark, or to the Rich Hill Bank.

The report then adds: "There is no evidence that the directors of the home had any knowledge of this confusion of accounts and shifting of credits practiced by Tygard, as they appear only in the books and in the accounts of the Bates National Bank."

The report then sets out that Tygard had general supervision of the management of the Bates National Bank; that J. C. Clark, it vice-president and cashier for twenty years, and S. F. Warnock had charge of the details of its business; that for three years before its failure the board of directors of the bank consisted of Tygard, Clark, Newberry, Edwards and Warnock, which held meetings every month or two months at which the president (Tygard) would submit statements of the condition of the bank; that "these reports showed his personal account and an account as treas-

urer of the Masonic Home and an account as treasurer of the Grand Commandery, and that he gave checks on the bank and made deposits or transfers of credits or debits in connection with these various accounts;" that the bank had a discount committee who examined paper offered for that purpose; that the two notes mentioned in the first and second counts of plaintiff's petition were discounted; that Tygard said to the cashier at the time "the home was needing money to pay for improvements and had overdrawn its account;" that Tygard admitted to him after the failure of the bank that he had no authority to make these notes; that interest appeared to have been paid upon them; that the books of the bank did not show from what source it was derived.

The referee then sets out a transcript of the balances shown by the treasurer's books to have been in his hands to the credit of the Masonic Home at the close of each year from July 31, 1904 to September 1, 1906. It shows that at the latter date he held to the credit of the defendant $1290.36, as above stated. The referee then makes the following itemized statement of the amount which plaintiff claims it is entitled to recover on the third count of its petition:

Warrants paid out of account of Tygard, treasurer of
    Home, in Bates National Bank ......................$ 3,524.79
Warrants paid out of account of Tygard ...............   4,507.70
Remitted out of personal account of Tygard in Bates
    National Bank to credit of Tygard, treasurer, in State
    National Bank and paid out for Home .............   4,500.00
Remitted out of account Tygard, treasurer, in Bates
    National Bank and credited to account Tygard, treas-
    urer, State National Bank, and paid out for Home.... 10,500.00
Received from Masonic Home and credited to
    Tygard in Bates National Bank............$ 2,350.00
Received from Masonic Home and credited to
    Tygard, treasurer, in Bates National Bank..$ 3,059.61 $ 5,409.61

       Total ..:................................$17,522.88

As to these items of account, the referee states that the warrants for the first item show that they were paid by the State National Bank; that presumptively the warrants for the second item were paid by the State National Bank; that the remaining two items claimed by plaintiff were between the period of January 11, 1906, and August 7, 1906, a little over seven months; that during this time the treasurer had in his hands a much larger amount to the credit of the home than the amount of both of these items; that the defendant had held in his hands since the first of September, 1905, as shown by his own books, $8347.40, and from that time to September 1, 1906, he had received in cash from the secretary $42,574; that from other sources (redemption of bonds and interest on loans) he had received during the same period $10,912.59, or total receipts the year ending September 1, 1906, $61,833.99; that his total expenditures as treasurer of the home during said year were $60,543.63, leaving in his hands the balance aforesaid, which was paid over as aforesaid.

This report of the referee was accompanied by his conclusions of law, upon which, as applied to the facts found by him, he recommended judgment in favor of the defendant.

Exceptions were filed to his report by plaintiff, which were overruled by the court except as to the amendment by interlineation shown in the italicized sentence above. Thereupon, the court affirmed his report, and rendered judgment in favor of the defendant, from which plaintiff has duly perfected its appeal to this court.

OPINION.

I. The plaintiff (appellant) claims that Tygard embezzled money of the Bates National Bank, of which he was president, to pay certain creditors of the Ma-

sonic Home, of which he was treasurer, in a sum suffi-
cient to replace his misappropriation of funds which
came into his hands as such treasurer. Plaintiff (ap-
pellant) further claims that the Masonic Home knew
of these facts and thereby became liable in the pres-
ent action "as for money had and received."

Before discussing the law applicable to this as-
sumed state of facts, it is necessary to ascertain from
the record whether the evidence proves that it really
existed.

There is not a shred of evidence in this record
that the Masonic Home had any knowledge that any
of the moneys placed in the custody of its treasurer
were embezzled or misappropriated. His books as
such trustee were annually and also monthly examined
and compared with those kept by the home by expert
accountants, and found to be correct, both as to his
receipts and disbursements, and the balance due at
end of his office was paid over.

It may be conceded that Tygard did use these
trust funds in his own ventures, but there is no evi-
dence that the Masonic Home was aware of that fact.
There is evidence that Parsons, defendant's secre-
tary, knew the treasurer did not at all times have
enough of the home's money on deposit in the State
National Bank at St. Louis to meet checks on said bank
for current expenses and obligations of the home; but
there is no evidence that the secretary knew that the
remaining funds of the home were not on deposit in
the Bates National Bank, in the county where the
treasurer lived.

The by-laws of the Masonic Home did not require
him to maintain his deposits as treasurer in any one
of the four banks in St. Louis which he successively
used to receive collections in the first instance, and
where the secretary was required to deposit them to
his account as treasurer. He might, at any time after

they were put to his credit, transfer any part of them to another depositary, and he did receive a large part of these funds and place them to his account as treasurer in his home bank in Bates county. Hence, the fact that, on occasion, he did not have in the St. Louis bank enough of the home's money to pay a check thereon in the form of a warrant (as prescribed in the by-laws) afforded no evidence that the full amount of the money shown by his books to be then in his hands was not comprised in the aggregate sums then to his account as treasurer in the Bates National Bank and in the St. Louis banks.

The referee was well warranted by the evidence in so finding. It is no doubt true that if the defendant had distrusted the showing of its treasurer's books and had undertaken to ferret out all of the depositaries and receptacles wherein he kept its money, it would have discovered that he was engaged in speculations, and that the portions of its funds which he had transmitted to his account as treasurer in the Bates National Bank were used by him for the benefit of that bank, and in joint enterprises with the cashier of that bank, and for other purposes; but there was nothing in the transactions between him and the defendant up to that time which imposed that duty upon it as a matter of law.

A careful analysis of the testimony of Clark, the cashier of the Bates National Bank (who was jointly acting with Tygard in some of the uses of the money to his credit as treasurer of defendant) discloses that the funds so used were fully replaced. As to this he testified: "Q. And did Tygard and Clark pay back all of the money you say they borrowed in that way of the Masonic Home? A. Yes, sir, and a good deal more." This witness also states that for the overdrafts of Tygard or any other depositor, the bank extended credit to them and expected them to repay such

indebtedness. This consists with the rule of law that the relation of debtor and creditor subsists between a bank and its depositors. [Utley v. Hill, 155 Mo. l. c. 259.] This rule is necessarily reciprocal, so that when a bank permits its customer to overdraw, he thereby becomes the debtor and the bank the creditor, or a reversal of positions takes place without any change in the nature of their legal relations.

The act of Tygard, with the consent of the Bates National Bank, whereby he withdrew the money of other persons and deposited it in his own name, if it did not charge the Bates National Bank with a trust, certainly could not charge the Masonic Home, or anyone to whom Tygard gave checks on the accounts thus established, with any obligation whatever to the bank. For if this were so, then no person could safely receive payment of a check without incurring a resulting liability to the bank which honored it, if the bank could show that the drawer of the check had created an account in his favor by depositing in his own name money which he held for another. Such a theory is unsound in law and impractical in business dealings.

So in the case at bar, when the Bates National Bank accepted deposits by Tygard as treasurer and afterwards consented to a redeposit of money drawn from that account by him in his own name, it thereby precluded itself from calling on any person to whom he gave a check on his personal account thus established, to reimburse the sums paid by the bank on such checks, whether they exceeded the account of the drawer or not.

The evidence in this case proves that the Bates National Bank received out of the money of defendant deposited originally in the State Bank of St. Louis a larger sum than was returned; that it permitted Tygard to divert this money in a great degree to his own uses by crediting it to his personal account. The fact

that it afterwards permitted him to overdraw his personal account furnishes no legal ground for a recovery from this defendant or any other payee of the balance due said bank on the overdrafts made by Tygard. This seems to be the only manner in which Tygard conducted his business in the Bates National Bank so as to become its debtor. He did not rob the till nor purloin the money in its vaults. What he actually did, as far as this record shows, was the creation of accounts, personal and otherwise, upon which he made overdrafts which were not repaid. This undoubtedly left him a debtor for the amounts thus loaned him by the bank, but it did not make the persons to whom he paid the money either debtors to, or trustees for, the bank. As to such third parties, the maxim applies, *Res inter alios acta alteri nocere non debet.* [Broom's Legal Maxims (8 Ed.), p. 954.]

Our conclusion is that the undisputed facts in this record, which we have re-examined (since the case is one wherein a compulsory reference might be ordered, Williams v. Railroad, 153 Mo. 1. c. 495) clearly sustain the deductions of the referee, that the Masonic Home stood in no relationship either of knowledge or conduct which rendered it liable to account for the money paid out by its treasurer on its behalf in the discharge of his duty to account for funds entrusted to him.

This disposes of this appeal and renders it unnecessary to discuss the applicability of the rule enounced by a divided court in Newell v. Hadley, 206 Mass. 335, as to the measure of responsibility incurred by the principal where his agent has stolen the money of another to repay a theft from his principal, and suit is brought by the third party to recover from the principal.

The proposition that the owner of personal property which is subject to identification, does not lose

his title thereto by the act of one who steals it and sells it to an innocent purchaser, is fundamental in the law. The doctrine, however, on grounds of public policy and business necessity cannot be applied to unidentifiable money which has been received in good faith and for value by a payee of the person who obtained it by theft. But the case in hand does not call for the application either of the rule or its modification, for the facts necessary to support the legal theory on which appellant asks the reversal of this case are essentially lacking in the record before us.

The judgment of the trial court was manifestly for the right party and is affirmed. *Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of Bond, C., is adopted as the opinion of the court. All the judges concur, except *Graves, P. J.,* not sitting.