AMERICAN SURETY CO. OF NEW YORK
v. FIRST NAT. BANK IN WEST
UNION.

No. 12.

District Court, N. D. West Virginia.

April 30, 1943.

Walter Higgins, of New York City, and Robert R. Wilson, of Clarksburg, W. Va. (Royal F. Shepard, of New York City, on the brief), for plaintiff.

Samuel A. Powell, of Harrisville, W. Va., for defendant.

HARRY E. WATKINS, District Judge.

As surety upon the bond of Clyde C. Ware, trustee in bankruptcy, plaintiff seeks to recover from the defendant bank the sum of $4,843.62, the amount which it was required to and did pay for the default of such trustee. Upon an agreed statement of facts, supplemented by oral testimony, the case was submitted to the court for decision in lieu of a jury.

The theory upon which defendant's alleged liability is predicated is as follows: That the bank permitted the trustee to deposit checks payable to him as trustee in bankruptcy to his personal account in such bank, and thereafter permitted him to withdraw such funds by personal check; that such funds were misappropriated; that the bank had actual knowledge of the trust character of such funds, and actual or constructive notice that they were being misappropriated; that with such knowledge the bank became a party to the fraud by paying the checks, and is liable to the surety who has paid the default, and taken an assignment of the claim; that the bank also cashed certain checks payable to the trustee in bankruptcy, which cash was misappropriated by the trustee, for which the bank is liable to the surety for the same reason. The defendant says that it had no knowledge of either the trust character of the funds or of the misappropriation; that the funds were deposited to Ware's personal account and regularly withdrawn by him; that it was not a designated depository of bankruptcy funds such as to require a countersignature to the checks; that it handled these checks in the ordinary manner; that it did know and was under no duty to inquire or investigate the purpose for which the funds were being used.

Plaintiff is a New York corporation, engaged in the business of executing surety bonds for fiduciaries and other persons for hire. Defendant is a national bank operating in West Union, county seat of Dodd-ridge County, West Virginia, a rural town with a population of about 1,500. At the time in question it had about 2,500 active accounts of depositors, against which about 500 checks were drawn daily. It had four regular employes, consisting of a cashier, assistant cashier, and two bookkeepers. There were two banking institutions in the town, neither of which was a designated and qualified depository for bankruptcy funds.

Clyde C. Ware, an attorney, opened a checking account with the defendant bank on January 23, 1934, by depositing with it a credit balance of $200. It was a general account in the name of "Clyde C. Ware" into which he placed personal and trust funds, without segregating them in any way. Trust funds deposited in the account were disbursed by checks drawn against the account in favor of creditors or other persons legitimately entitled thereto, and all checks were signed "Clyde C. Ware". He and his wife would check on the account when money was needed for personal living expenses or otherwise. He carried a similar account with the other bank. He did not default in any trust account except the one involved in this action.

Between January 23, 1934, and December 8, 1937, Ware deposited an aggregate of $16,535.38 in this account, which was withdrawn by 536 checks ranging from $1 to $701. He was associated in the practice of law with Senator L. A. Henderson, under the firm name of Henderson and Ware. The firm had the largest law practice in town and represented one side of practically every legal action in the courts of the county. Each member of the firm enjoyed an excellent reputation for legal ability, honesty and integrity. Ware was president of a leading civic service club, abstracter for the Home Owners Loan Corporation, and handled checks covering loans made by such corporation. The employes of the bank considered Ware honest and trustworthy, asked no questions concerning his account at the bank, and Ware gave them no information concerning his account.

About October 10, 1934, Ware was named trustee of the estate of Eli Nutter, bankrupt. Bond was furnished by him, in the penalty of $5,000 with the plaintiff as surety. About three years later the trustee received from Pittsburgh & West Virginia Gas Company eight checks aggregating $4,050, drawn upon a Pittsburgh

bank, payable to the order of "Clyde C. Ware, Trustee in bankruptcy of Eli Nutter, Stuart Building, West Union, W. Va." The proceeds of these checks constituted assets of the bankruptcy estate and vouchers attached to the checks showed that they were in payment of royalties due bankrupt upon certain gas wells. They were endorsed in blank as follows: "Clyde C. Ware, Trustee in bankruptcy of Eli Nutter", and on August 27, 1937 were presented to J. Freeman, a son of the cashier, by Ware, who requested that the proceeds or commercial value thereof be deposited to the credit of his personal account, which was done, subject to the ultimate payment of the checks. Upon the deposit slip delivered to Ware, the following words were printed: "We use the utmost care in selecting the bank to which we send your checks for collection, but will not be responsible until final payment". Thereafter the checks were paid by the Pittsburgh bank, and Ware withdrew all of such funds by his personal checks and such checks were paid by the bank in due course. Some of the checks were signed by Ware's wife under verbal authority to draw on the account. Between August 27 and December 8, 1937, two additional deposits were made to the credit of this account, one on September 10 of $33.80 and one on December 7 of $105.27. It does not appear from the record whether these deposits were of personal or trust character, but they were not a part of the bankruptcy estate. During this period 109 checks were drawn against the account, which closed the account. None of the checks was countersigned by a referee in bankruptcy or other officer of the court.

During the same period Ware received ten other checks from the same company, aggregating $600, payable to him as trustee in bankruptcy of Eli Nutter, which he endorsed in the same manner, presented to the bank and received cash thereon. He also received two checks aggregating $193.62 from Hope Natural Gas Company, payable to the order of "Clyde C. Ware, Trustee, West Union, W. Va.", which he endorsed in the same manner, presented to the bank, and received cash thereon.

On December 6, 1937, Ware was ordered to make distribution of the funds of the bankruptcy estate, in consequence of which it appeared that a deficit had been made by the trustee in the sum of $4,670.33. Ware was removed as trustee and Lafayette C. Crile was appointed in his stead. Upon application of the new trustee, the surety company was adjudged to be liable to the bankruptcy estate in the sum of $5,000 which it thereafter paid, and took an assignment of the claim from the new trustee. This action was instituted by plaintiff surety company more than four years after it discharged its liability under Ware's bond.

No part of the proceeds of any of such checks, or any other assets of the bankruptcy estate were used to pay overdrafts or other personal obligations of Ware to the bank. The bank did not profit or receive any benefit from the manner in which Ware negotiated and applied the proceeds of these checks, other than that incident to the relationship between bank and depositor. I see no merit in the contention of the plaintiff that the bank did receive a benefit, "in that, since Ware had no money of his own in the account any advances made to him or on his order were in the nature of overdrafts or loans secured, in the eyes of the bank at least, by deposit of trust moneys to which the bank had and took recourse when Ware, contrary to the bank's hopes and expectations, turned out to be financially irresponsible and unable to pay his obligations to the bank or others out of his own money". An overdraft is the payment by a bank from its funds of a check drawn upon it by a depositor who does not have sufficient funds on deposit to pay the check. Whatever else he did, Ware did not overdraw his general account. At all times he had enough money in the account to pay all checks drawn against it.

In an effort to show actual knowledge by the bank of the trust character of the funds and that the bank actually knew that the funds which they were then paying out were being misappropriated by Ware, the surety company called Ware, J. A. Freeman, cashier, and G. W. Hill, assistant cashier of the defendant bank. Ware said he kept a general account in the bank into which he deposited all kinds of funds, personal and otherwise, including money which came into his hands as special commissioner and trustee, which funds were always withdrawn by checks signed "Clyde C. Ware"; that he did not inform the officers or employes of the bank that these checks did not belong to him, and never told them what he was doing with his money. He was asked whether the officers of the bank knew that he was mis-

appropriating any trust funds and replied, "I certainly know they did not".

The cashier testified that he did the "head" work at the bank, made reports and sometimes took in deposits; that he saw the deposit slip for the $4,050 deposit but did not raise any objection; that an examination of the checks would have indicated that they were bankruptcy funds, but he did not know whether they belonged to the bankruptcy estate, or whether Ware could have gotten hold of the funds in some other legal angle of the bankruptcy case. He stated that he never saw the checks withdrawing the money until the morning he testified; that an examination of them would indicate that they were not for the benefit of the bankrupt estate, but none of the employes of the bank examined the checks as they came in, to see for what purpose the money was being used; that they would not have time to do this; that in accepting a deposit to a personal account, they were interested in seeing that the checks were all right, properly endorsed, signed and properly drawn; and in honoring checks drawn on that account and other accounts they did not investigate to see for what purpose the money was being used, but looked only to see that the check was properly written, signed by the maker and endorser, and that there was sufficient money on deposit to pay the same. He denied that any officer or employe of the bank knew that these funds were being used to pay personal debts, and stated that he first learned of the misappropriation when Ware made his final settlement.

G. W. Hill, assistant cashier, who posted checks said that the first time he knew that the $4,050 deposit was a trust fund was the day the bank was notified that it was being sued; that he did not now know for what purposes the checks drawn against the account were used, other than what was shown on the checks themselves, and in posting these checks and others he paid no attention to that matter; that he had no knowledge or thought in mind that Ware was misappropriating any of the money. He knew that Ware was accustomed to putting trust funds in his general account at the bank "and presumed that he was keeping close tab on each deposit".

These three bank employes were the only witnesses offered by the plaintiff. After hearing them testify and observing their demeanor, it is quite clear to me that no officer or employe of the bank had notice or knowledge of Ware's misappropriation of these trust funds. In this respect plaintiff has failed in its proof. We must now look to the legal effect of its failure to show such notice or knowledge.

Many cases have arisen involving the liability of a bank, where, with actual or constructive knowledge of the character of trust funds, the bank has permitted a customer to deposit such trust funds in his personal account with the result that they were thereafter misapplied. Some of these cases are confusing because they do not mention the very fundamental distinction between misapplications made by the bank itself or made for its benefit, and those in which the bank merely pays to other persons checks regularly drawn against the account. The difference has very properly resulted in different rules. If the bank itself receives the trust funds to pay individual debts due it, with actual or constructive knowledge of their trust character, it becomes a transferee, and it is the ordinary case of tracing a trust fund. In such cases the general rule is that where there are words indicating a representative or fiduciary capacity following the name of a payee, indorser, or indorsee on commercial paper deposited in a bank, the bank is chargeable with notice of the trust character of the instrument. Restatement, Trusts, § 297 (o), 7 Am.Juris. 373; 61 A.L.R. 1401, 1402. Where the bank has itself taken the trust funds for its own benefit in any identifiable form, it must surrender them unless it can show that it was a bona fide purchaser for value without notice. If it actually knew of the trust, or if the circumstances are such as to incite inquiry and to lead to knowledge, it does not stand in the position of a bona fide purchaser without notice, but by accepting such payment participates in the misappropriation. United States Fidelity & Guaranty Co. v. Hood, 1940, 122 W.Va. 157, 7 S.E.2d 872. This general rule is just and equitable because the bank loses nothing except what it should never have had. When, however, one seeks to hold a bank liable, not for what it has that belongs to another, but to pay what others received, the result is very different. In such case the trust fund is not traced into the hands of the bank, but out of the bank to those who got the money on checks which the customer drew. The bank has nothing which it ought to surrender. It is sought to be punished for surrendering the money to the wrong persons. Such is the case now

under consideration. To hold the bank liable in such circumstances, it is always necessary to show the further fact that the bank had notice of the misappropriation. Grace v. Corn Exchange Bank Trust Co., 1941, 287 N.Y. 94, 38 N.E.2d 449; 115 A.L.R. 649. Though there are some decisions to the contrary, according to the great weight of authority, a bank is not charged with notice of misappropriation by an agent or fiduciary merely because the latter deposits to his individual account a check payable to or endorsed by him in his fiduciary capacity. 7 Am.Jur. 376; New Amsterdam Casualty Co. v. Robertson, 129 Or. 663, 278 P. 963, 64 A.L.R. 1402; Restatement, Trusts, § 324 (d). Neither is such fact sufficient to charge the bank with notice of a fraudulent intent to misappropriate the trust funds, nor require it to make further inquiry, nor require it to supervise the subsequent distribution of the funds by examination of the checks drawn on such account, or otherwise. See 5 Michie Banks and Banking, 187, citing as authority upon this point the case of United States Fidelity & Guaranty Co. v. Home Bank, 77 W.Va. 665, 88 S.E. 109. This is one of the leading cases in the country upon the subject here involved, and a case which is cited with approval by most text writers. Restatement, Trusts, 324(g). See, also, Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, 761, L.R.A.1916F, 1059, wherein the court said: "A bank does not become privy to a misappropriation by merely paying or honoring the checks of a depositor drawn upon his individual account in which there are, in the knowledge of the bank, credits created by deposits of trust funds. The law does not require the bank, under such facts, to assume the hazard of correctly reading in each check the purpose of the drawer, or, being ignorant of the purpose, to dishonor the check. The presumption is, and after the deposits are made remains, until annulled by adequate notice or knowledge, that the depositor would preserve or lawfully apply the trust funds. The contract, arising by implication of law, from a general deposit of moneys in a bank is, that the bank will, whenever required, pay the moneys in such sums and to such persons as the depositor shall direct and designate. Although the depositor is drawing checks which the bank may surmise or suspect are for his personal benefit, it is bound to presume, in the absence of adequate notice to the contrary, that they are properly and lawfully drawn." 5 Michie Banks and Banking, 129, and cases there cited. In such cases we must always keep in mind that the bank is in no way enriched, that it did not select the fiduciary, and is giving a character of service which should not be charged with the peril of such liability. Those for whom the fiduciary acts can find their protection in his financial worth, integrity, or his bond. The surety can protect itself by joint control of bank deposits and by timely audits of the fiduciary account. Rodgers v. Bankers' National Bank, 179 Minn. 197, 229 N.W. 90, 93. The uniform Fiduciaries Act, which has been adopted in several states embraces this policy of nonliability of the bank. It is obvious that any other rule would throw upon a bank the duty to inquire as to the appropriation of all trust funds deposited with it. Such a duty would practically put an end to the banking business. No bank could possibly conduct business if, without fault on its part, it were held accountable for the misconduct of its depositors who occupy some fiduciary relation to the fund placed by them with the bank. Duckett v. National Mechanics Bank, 86 Md. 400, 38 A. 983, 39 L.R.A. 84, 63 Am.St.Rep. 513; Helena v. First National Bank, 173 Ark. 197, 292 S.W. 140, 141; 5 Michie Banks and Banking, 132.

When checks are regularly drawn it is the bank's general duty to pay them so long as the funds last without making inquiry into the propriety of the customer's order to pay. Board of Chosen Freeholders v. Newark City National Bank, 48 N.J.Eq. 51, 21 A. 185. The bank is entitled to and should assume that the customer is honest. "It is only when the bank knows that an actual misappropriation is intended or is in progress that it should decline such a deposit or refuse to honor regular checks against it on pain of being itself held liable for misappropriation. The penalty thus visited ought to be supported by the mala fides of a fraudulent intent, or by a negligence so great as to show wilful ignorance. Simple neglect to enquire about circumstances which ought to have excited attention is not enough, just as it is not enough to prove a want of good faith in purchasing negotiable paper." Atlanta & St. A. B. R. Co. v. Barnes, 5 Cir., 95 F.2d 273, 276; Connecticut Fire Ins. Co. v. Commercial Nat. Bank, 5 Cir., 87 F.2d 968.

For authorities contrary to the general rule see United States Fidelity & G. Co. v. People's Bank, 127 Tenn. 720, 157 S.W. 414; Bank of Hickory v. McPherson, 102 Miss. 852, 59 So. 934; Mitchell v. First Natl. Bank, 203 Ky. 770, 263 S.W. 15.

Defendant's liability must be tested by the law of West Virginia. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Metropolitan Life Ins. Co. v. Goodwin, 4 Cir., 92 F.2d 274. The leading case of United States Fidelity & Guaranty Co. v. Home Bank, supra [77 W.Va. 665, 88 S.E. 111], states the West Virginia law as follows: "To render a bank of deposit liable for the default or misappropriation by a fiduciary of a trust fund deposited it must have actually participated therein, or with knowledge reaped some benefit therefrom, as by itself appropriating the money or receiving it in payment of some individual indebtedness of the fiduciary to it, and thereby rendering itself liable as trustee or otherwise."

In that case checks payable to "Dever Boring, Administrator of R. M. Boring, Decd." were endorsed by Boring as such administrator, and, at his direction, credited to his individual account. The complaint charged that defendant permitted him to draw out a part of such funds "on his individual checks and to be thereby appropriated to his own use, in violation of and in breach of his trust, and that he thereafter died insolvent and indebted to said estate in the sum which plaintiff as his surety on his bond had been required to pay for his defalcation as aforesaid; Third, that defendant, at the times it so received said checks and credited the same to the individual account of Dever Boring, had notice that the same represented funds belonging to the estate of Rachael M. Boring, deceased, and were not the individual funds of said administrator; and, moreover, that if defendant did not have actual knowledge of the fiduciary character of said funds, it was chargeable with notice thereof upon the face of the checks, and that it was its duty to have placed the same to the credit of Dever Boring, as administrator, and not to his individual account; and furthermore should not have permitted him to withdraw the same or any part thereof upon his individual checks, and thereby to appropriate the said money to his own use, and whereby defendant, along with said Dever Boring, was guilty of the unlawful conversion and misappropriation of said money, and liable with him to the said estate and to the heirs of said Rachael M. Boring, and that plaintiff as surety and by right of subrogation or substitution is now entitled to recover from it the amount paid in discharge of said liability; and the prayer of the bill is for a decree against defendant for the amount so paid by it on account of its liability on said bond."

In holding that the complaint did not state a cause of action, the court pointed out that it is not alleged that the bank reaped any benefit from the deposits, "and it is not charged that the bank in any other way participated in the misappropriation of the money or the default of the administrator, nor that it had any knowledge of the fact or intention to so misappropriate the fund, other than what might be derived from the face of the checks deposited and those upon which the funds deposited were drawn out * * *."

The court continued: "For ought a bank would know a check though payable to its depositor in some representative or fiduciary character, the money would belong absolutely to him, and represent money already paid out by him in discharge of his fiduciary liability; the bank cannot assume that money paid out on checks of a fiduciary is being misappropriated, and it has the right to assume that it is being properly appropriated, at least until it has actual notice to the contrary. To place the burden of supervising all such accounts upon a bank of deposit would be unreasonable, and one which few institutions, if any, would be willing to assume; indeed it would be unbearable, and to do so would in many cases deprive all fiduciaries of banking privileges, and work a detriment to estates and fiduciaries generally." This case was cited and approved in United States Fidelity & Guaranty Co. v. Hood, 1940, supra. The same case was cited and approved in Cocke's Adm'r v. Loyall, 150 Va. 336, 143 S.E. 881, 884, wherein the court said: "Banks are essential factors of modern business life. A tremendous and increasing proportion of the business of the country is transacted through them. Their primary function is to guard not their depositors but their deposits, and in the exercise of this function they should be held to a strict accountability. This is required by reason and by law. Beyond this sphere their actions should be measured by the same rules as measure the actions of others. Any other standard

would be artificial, or at least discriminatory. * * * To hold them liable when they have received no benefits nor violated any contract, express or implied, would be to measure their acts by more stringent rules than are applied to others." Plaintiff takes the position that "it is sufficient to show, * * * that defendant's employes were aware or would have been aware of Ware's irregularities, had they made inquiry * * *". Such is not the general rule and is not the law in West Virginia. There was no duty upon the defendant bank under the circumstances of this case to make inquiry as to how or for what purpose Ware was spending these funds. The facts stated show that the bank had every reason to presume that Ware was honest and trustworthy. He was a successful young attorney and his reputation for integrity was of the highest in that community. The bank did not doubt his honesty, neither did the surety company, because it was willing to sign his bond, and to assume actual liability for his conduct, without requiring joint control of the trust assets. The bank was not extending him credit, and had no particular reason to inquire into his honesty, much less conduct any type of inquiry to save the surety company harmless from a liability which it voluntarily assumed for profit. It seems far fetched for plaintiff to insist so vehemently that the bank should now pay to the surety company what it lost, because the bank "took chances" and placed too much faith in Ware.

To state these legal principles is to answer the similar charges made by plaintiff in this case. The presumed innocence and good faith of the bank has not been disproved by the plaintiff. Plaintiff has failed to show the essential requirements for recovery under these general legal principles and particularly as required in West Virginia.

Reference has been made by plaintiff to Bankruptcy General Order 29, 11 U.S.C.A. following section 53, which requires checks to be countersigned by the judge or referee when money is withdrawn from a designated and qualified depository of bankruptcy funds. The defendant bank was not such a designated depository, and did not receive the funds as such. General Order 29 and provisions of the bankruptcy law intended to afford adequate protection to the bankrupt estate are not designed to define the liabilities of banks generally having relations with trustees in bankruptcy, their commands being directed to the designated depository and the trustee, and the law applicable generally to a bank receiving deposits of fiduciary funds controls, even though the funds belong to a judicial or official trust and their deposit is a violation of a law defining the duties of the proper custodians. Rodgers v. Bankers' National Bank, supra, 9 C.J.S., Banks and Banking, § 294, p. 611, 5 Michie Banks and Banking, 130; New Amsterdam Casualty Co. v. Robertson, supra. In Manufacturers' Trust Co. v. United States, etc., Co., 122 Misc. 726, 204 N.Y.S. 105, 110, where a statute was violated by the trustee depositing trust funds in his individual account, it was held that the trust company was not liable for a dissipation of the trust funds unless it had actual notice or participated in the conversion. This same principle is recognized in plaintiff's brief wherein he states: "It is not contended by the plaintiff that there is anything in the federal statutes, rules and orders, which, without more, imposes an absolute liability in the premises upon the defendant". See, also, Southern Surety Co. v. West Side State Savings Bank, 207 Iowa 910, 223 N.W. 865.

Defendant asserts that this action is barred by the statute of limitations (Ch. 55, Art. 2, § 12, W.Va. Code). The statute provides that if the action is of such a nature that in case a party die it can be brought by or against his personal representative, the period of limitation is five years, otherwise one year. Both parties agree that in West Virginia the test of survival depends upon the question of whether the injury to property was direct. Horton v. Tyree, 102 W.Va. 475, 135 S.E. 597. Defendant says that the complaint alleges indirect and not direct injury to the property of the bankruptcy estate, and that the limitation period is one year. I am unable to agree with defendant on this point. The grievance complained of is not one perpetrated through the agency of another. The bank is charged with a direct violation of the property rights of the creditors of the bankruptcy estate, in that, jointly with the trustee, it made away with the trust funds, and was a party to the fraud. It was because of this very broad allegation in the complaint that I overruled defendant's motion to dismiss the complaint.

For the reasons stated, judgment may be entered for the defendant with costs.