284 F.2d 567
 94 A.L.R.2d 638
 FLORIDA TRAILER AND EQUIPMENT COMPANY, Appellant,
v.
Wiley R. DEAL, as Trustee in Bankruptcy of the Bankrupt,
Farley Taylor, d/b/a Taylor Bodies, and the City
National Bank of Dothan, Appellees.
 No. 18262.
 United States Court of Appeals Fifth Circuit.
 Nov. 23, 1960.
 
 Truman Hobbs, Montgomery, Ala., Douglas Brown, Ozark, Ala., Brown & Steagall, Henry B. Steagall, II, Ozark, Ala., Hugh R. Dowling, Jacksonville, Fla., for appellant.
 J. Robert Ramsey, W. G. Hardwick, G. M. Harrison, Dothan, Ala., for appellees.
 Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.
 BROWN, Circuit Judge.
 
 
 1
 This appela really presents the question whether there was such an abuse of discretion in the Referee's approval of a proposed settlement that the District Court erred in not setting it aside. We emphasize really because the Objecting Creditor (now appellant) in the hearing before the Referee, on the petition of review in the District Court and again here in briefs and arguments, persists in treating the matter as though this were an appeal from a decision on the intrinsicmerits in an initial adversary proceeding. The two are quite different.
 
 
 2
 This matter started as a formal application by the Trustee under 27 of the Bankruptcy Act, 11 U.S.C.A. 50,[1] for leave to settle all controversies (save one specifically excepted) between the Bankruptcy Estate and the City National Bank of Dothan, alabama. The application recited that there was then pending in the same Federal District Court the Trustee's plenary suit against the Bank. The application annexed copies of that complaint which in trun incorporated a series of chattel mortgages by the Bankrupt to the Bank and assignments of installment sales, chattel mortgages presumably executed by purchasers of trucks or trailers from the Bankrupt. It set forth that within four months of bankruptcy the Bank received one payment in case ($6,000) and took possession of specified vehicles on which it claimed to be the mortgagee or assignee under the chattel mortgages. The theory of the Trustee's plenary suit was that by failure of the Bankrupt properly to record the mortgages they were not perfected under applicable state law and were therefore deemed to have been perfected immediately before the filing of the involuntary bankruptcy petition. This, it was asserted, on familiar principles would constitute the payment of an antecedent debt and a voidable preference under 60, 11 U.S.C.A. 96, because of the known insolvency of the Bankrupt. The suit sought recovery of the cash payment and in effect cancellation of the mortgages and the restoration of the property (or payments) held by the Bank as a secured creditor. The Trustee's 27 application sought approval of a tentative settlement reached between the Estate and the Bank. The substance of it was that the Bank would restore the $6,000 payment to the Bankrupt and the Bank would withdraw its claim as a secured creditor thus effectually restoring to the Estate the value of the accounts receivable (or the security) represented by the assigned chattel mortgage installment sales contracts.
 
 
 3
 On the filing of the application appropriate notice was given to all creditors. No objection was then or ever filed to its sufficiency under General Orders 28 and 33, 11 U.S.C.A. following section 53. 2 Collier, Bankruptcy 27.03 at 1085 (14th ed. 1956). The Objecting Creditor (Florida Trailer and Equipment Company) filed a detailed objection which set out with great elaboration its contention that there was a substantial claim in favor of the Bankrupt Estate against the Bank for a voidable or recoverable preference growing out of the Bank's handling of cumulative daily overdrafts. Consequently, it urged, the proposed settlement ought not be approved.
 
 
 4
 As we stated in the beginning, the gauge was accepted on the basis of this objection. The battle lines were drawn on it. Almost all of the evidence bore solely on it. Whatever deficiency there might have been in the Trustee's 27 application occasioned by the omission of a specific reference to any such potential claim was either waived, 2 Collier, Bankruptcy 27.03 at 1088 (14th ed. 1956), or more properly the issues were expanded by implied consent. F.R.Civ.P. 15(b), 28 U.S.C.A.; General Order 37; Bixby v. First National Bank of Elwood, 7 Cir., 1958, 250 F.2d 713, certiorari denied356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1065. It is likewise immaterial that-- as now urged by appellant-- the Trustee's underlying plenary suit did not assert any such claim against the Bank since the implied evaluation of this asserted potential claim became the principal subject of the hearing. The right and power of the Trustee to settle subject to court approval extends to controversies and not merely those involved in pending suits. 2 Collier, Bankruptcy 27.02 at 1083 (14th ed. 1956); Matter of Towers Magazines, Inc., D.C.Pa.1939, 27 F.Supp. 693.
 
 
 5
 As we are not dealing with the question of what judgment ought to have been rendered had the trial been in a plenary suit by the Trustee against the Bank to recover this asserted potential preference, we need not discuss the facts in any detail. The theory of the Objecting Creditor was that the Bank had for many months continuously allowed the Bankrupt to overdraw its checking account. The significance of this from a bankruptcy standpoint was that the subsequent deposits received to make good the overdrafts were in effect a preference payment of an antecedent debt to one having knowledge of insolvency.
 
 
 6
 The proof offered to sustain this was largely an accountant's analysis of the Bankrupt's checking account over a period of about six months. Neither the Bank's ledger nor the Bankrupt's bank statements showing daily withdrawals and deposits ever reflected an overdraft as such. But this analysis did show that on many days large amounts of checks would be presented to the Bank through clearing house channels for payment. Frequently the opening balance of the Bankrupt was nominal so the checks could not be honored. Checks in excess of the Bankrupt's balance would either be held or returned. The 'held' checks[2] would simply be held from periods of one to two days, but not in excess of the time allowed under the Federal Reserve rules.[3] The Bankrupt would then make a deposit of checks of third persons in sufficient amount to cover the 'held' checks whereupon they would be accepted and honored. The Bank made a charge of $1.00 for each of the checks returned or held.
 
 
 7
 In an effort to establish that in effect the Bank was extending credit daily to the extent of these daily deficiencies ('overdrafts'), the Objecting Creditor also undertook to prove that to the Bank's knowledge the Bankrupt was engaged in check kiting with several others. It worked this way. The Bankrupt would obtain a check payable to Bankrupt from a third person and simultaneously give its check for like amount to the third person. The Bankrupt would hten deposit the trird party's check in his account with the Bank, and the Bank, treating that deposit as a reliable item, would pay checks drawn on Bankrupt's account then 'held' because of inadequate balance. Frequently on presentation to the drawee banks of such their persons, the checks would be dishonored either under a 'stop payment' order or for insufficient funds. Admittedly, as to three or four persons this operation was carried on extensively. The Bank's officers testified that they were not suspicious since at least two of these third-party drawers were represented by the Bankrupt to be its dealers whose 'stop payment' orders resulted from rejection of the trailers ostensibly purchased by the deposited check. In other instances, where the Bank declined to treat checks offered for deposit as items against which immediate withdrawals of 'held' checks could be made, the Bankrupt obtained checks of third persons which it deposited in the bank. Such third person would receive in exchange the checks which the Bank had insisted on taking as collection items. Indeed, the Objecting Creditor's claim against the Bankrupt resulted from its swapping its good checks thereafter deposited by Bankrupt for checks of third persons which were subsequently dishonored.
 
 
 8
 It was the Bank's theory that there is no overdraft until a check has been paid, that is, accepted. American Surety Co. of New York v. First National Bank, D.C.N.D.W.Va.1943, 50 F.Supp. 180, at page 183; State v. Jackson, 21 S.D. 494, 113 N.W. 880; 7 Am.Jur. 442. Holding a check for a limited time until the drawer's account would be sufficiently replenished by deposits to permit its being honored would not constitute payment. Consequently, it asserted, since the Bank had not yet honored the check and it would not have any liability as drawee thereon until it was accepted, there was no extension of credit and hence no debtor-creditor relationship. The Objecting Creditor, on the other hand, insisted that while normally acceptance by the drawee bank is required to constitute an overdraft, this total course of dealing showed irrevocably that the Bank was extending credit almost daily by the repeated holding of checks until, by a questionable, if not spurious, practice the Bankrupt would ostensibly replenish his account by checks which were known to be kited or swapped. Regardless of the form, then, this was the equivalent of an acceptance constituting an overdraft which would give rise to a debtor-creditor relation. Hennessy Bros. & Evans Co. v. Memphis National Bank, 6 Cir., 1904, 129 F. 557; Becker v. Fuller, 1917, 99 Misc. 672, 164 N.Y.S. 495; City of Pittsburg v. First National Bank, 1911, 230 Pa. 176, 79 A. 406; Vandagrift v. Masonic Home, 1912, 242 Mo. 138, 145 S.W. 448.
 
 
 9
 We think it would be improper for us to indicate what the rule of law should be. The Referee, although he undertook to reach a dispositive conclusion on it, was not faced with that necessity. Nor was the District Judge. What was properly before the Referee was simply this: in the light of the charge and countercharge made in the plenary suit and the Bank's claim as a secured creditor and the asserted potential preference claim for alleged bank overdrafts was the proposed settlement a reasonable evaluation of the risks of litigation?
 
 
 10
 Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for evaluation. But the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty. Parties would be hesitant to explore the likelihood of settlement apprehensive as they would then be that the application for approval would necessarily result in a judicial determination that there was no escape from liability or no hope of recovery and hence no basis for a compromise.
 
 
 11
 To effectuate this statutory and general policy, it is not surprising that the underlying principle is so simply and universally stated. 'The decision of the referee in bankruptcy as to the approval or disapproval of a compromise agreement rests upon his sound discretion. Such a decision is reviewable by the district judge, but will normally not be set aside except where there is a plain error or abuse of discretion.' 2 Collier, Bankruptcy 27.05 at 1091 (14th ed. 1956); Drexel v. Loomis, 8 Cir., 1929, 35 F.2d 800. And after affirmance of the Referee's approval by the District Court that order will not 'be reversed by the circuit court of appeals unless discretion has been abused.' Ibid. Scott v. Jones, 10 Cir., 1941, 118 F.2d 30, 32; In re California Associated Products Co., 9 Cir., 1950, 183 F.2d 946; Connecticut Railway & Lighting Co. v. New York, N.H. & H.R. Co., 2 Cir., 1954, 190 F.2d 305; Hair v. Byars, 5 Cir., 1937, 92 F.2d 684, 686; In re Prudence Co., 2 Cir., 1938, 98 F.2d 559; S. F. Bros. Co. v. Wiseman, 6 Cir., 1957, 244 F.2d 73.
 
 
 12
 Here there were many uncertainties, not the least of which was the novelty of this legal question. In their misguided belief that the case would be determined by the ultimate intrinsic correctness of the basic question of law on 'overdraft,' all counsel have undertaken extensive research of available materials. No case remotely resembling this one has been uncovered. Of course, that hardly paralyzes a common law system whose nervous system is a 'judicial inventiveness,' Textile Workers Union of America v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972, to meet new situations. But its very newness suggests the likelihood of the need for reliance on new materials. For example, what significance should the Federal Reserve rules, see note 3, supra, have? Are they intended to be anything more than the internal control among the banks in the complex chain of clearance to assure an orderly expeditious handling? Are they really to bear on the relationship between the drawee bank and its customer? And the hearing showed that uncertainties of the law were paralleled by like uncertainties in the facts. The Objecting Creditor asserted that the Bank retained the 'held' checks too long. The Referee after a trial expressly found that the Bank 'in no instance held (the checks) longer than the time permitted by the rules, and regulations of the Federal Reserve Bank * * *.' The Objecting Creditor also asserted that from this course of dealing the Bank knew that the Bankrupt did not have funds with which to pay checks drawn on its account and through the device of ostensible deposits of checks reasonably known by the Bank to be questionable, the Bank in effect was knowingly extending a credit as an equivalent of an overdraft. The Referee after the hearing expressly held, however, that 'it was common practice for said bank and other banks to regularly call their depositors concerning overdrafts of this nature, and if said deposits were not made within the time allowed by said rules of the Federal Reserve Bank, then said checks were returned because of insufficient funds,' and 'at no time * * * did the (records) show that the said bankrupt was overdrawn * * *' and consequently the Bank 'did at no time pay, accept or honor a check of the bankrupt out of the bank's own funds * * *.'
 
 
 13
 Moreover, the uncertainty in law and fact was not confined to the basic novel issue without which there would be no bank liability whatsoever. Assuming the Trustee would have been successful in establishing a debtor-creditor relation because of these repeated vicarious 'overdrafts,' the Bank nevertheless had the formidable advantage of claiming a 68, sub. a, 11 U.S.C.A. 108, sub. a, setoff. It has been pointed out that 'the result is that the bank fares better than other creditors of the Bankrupt not similarly situated. * * *' 4 Collier, Bankruptcy 68.16 at 760 (14th ed. 1942). To be sure such deposits must be made in good faith and in the regular course of business. Merely to state that standard is to recognize the inescapable uncertainty inherent in facts relating to it. If the deposit is not made in good faith or in the regular course of business, the right of setoff is not available. Elliotte v American Savings Bank & Trust Company, 6 Cir., 1927, 18 F.2d 460. But if the facts ultimately satisfy this standard, then deposits may be properly used to apply on any debts due the Bank.[4] Here to Referee found that Banks generally notify their customers of deficiencies and frequently retain checks for the time permitted under the rules to enable the customer to make deposits out of which payment can be made.
 
 
 14
 Obviously it would not be a settlement if to obtain approval the Trustee would have to demonstrate that he could not succeed had the preference claim been pressed. All that he must do is establish to the reasonable satisfaction of the Referee that, all things considered, Drexel v. Loomis, 8 Cir., 1929, 35 F.2d 800, 806, it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end. The Referee after an extended hearing which had been adjourned to allow the Objecting Creditor over a month's additional time to prepare its full attack specifically held 'that all of said matters * * * presented by said objecting creditor were known to said trustee and his attorney at the time said proposed petition of settlement was submitted to the court, and said alleged overdraft was fully considered by the trustee and his attorney in recommending said settlement, to the court * * *.' On that and the other findings briefly summarized by us, the Referee then found that the settlement was to the best interest of the Bankrupt Estate and should be approved by the Court.
 
 
 15
 Even conceding that on an adversary trial of the merits of the claim for preference because of these asserted overdrafts, a court might have arrived at the conclusion that this resulted in a debtorcreditor relationship and a consequent voidable preference, the Referee certainly did not abuse his discretion in evaluating the uncertainties of litigation by concluding that a settlement on these terms was a prudent thing. Nor did the District Judge abuse his discretion in affirming it. There it ends. And there it must end unless, as cannot possibly be the case, any objecting creditor is empowered to frustrate the Congressional policy encouraging compromises by the trustees merely by showing on the hearing for approval that if the claim thus released were properly asserted, the estate would likely win.
 
 
 16
 Affirmed.
 
 
 
 [1]
 'The receiver or trustee may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate.' 11 U.S.C.A. 50
 
 
 [2]
 For example, the 'held' checks for the period December 17, 1957-December 31, 1957, totaled $544,032.68. For ten banking business days this was an average of $54,403.27. Those for January totaled $646,981.04 or an average for twenty-four banking days of $26,957.54
 
 
 [3]
 Regulation J, Rule 5, Subsection 4 of the Federal Reserve Bank prescribes:
 'Any check which the Federal Reserve Bank or agent thereof presents to drawee bank for payment or sends to the drawee bank for collection, and for which remittance or settlement is made by drawee bank on the day which it receives 3 such check, may be returned for credit or refund at any time prior to midnight of the drawee's next business day following such day of receipt, or prior to the time provided by applicable clearing house rules, or special collection agreement, whichever is earlier, except this paragraph shall not apply to checks presented over the counter.
 '3. Check received by drawee bank on day other than its business day or received on a business day after its regular hours, during the afternoon or evening period, when it was reopened for limited function, shall be deemed to have been received on its next succeeding business day.' 12 C.Fed.Regs. 210.5(d).
 The accountant's analysis exhibit shows that the overwhelming majority of these 'held' checks were paid within 48 hours. Some were apparently paid at a later indicated date, but no evidence was offered showing in fact that any such payments were tardy under the rules or otherwise. Nor was there any effort below or here to translate to any specific checks a resulting preference in terms of dollars. The Bank's testimony refuted categorically the idea of late payment.
 
 
 [4]
 Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co., 1913, 229 U.S. 435, 33 S.Ct. 829, 57 L.Ed. 1268; Gruenwald v. Moir Hotel Co., 7 Cir., 1938, 96 F.2d 932, certiorari denied 305 U.S. 615, 59 S.Ct. 74, 83 L.Ed. 392; Joseph F. Hughes & Co. v. Machen, 4 Cir., 1947, 164 F.2d 983; Ribaudo v. Citizens National Bank of Orlando, 5 Cir., 1958, 261 F.2d 929, 933