**In re BICOASTAL CORPORATION d/b/a Simuflite, f/k/a The Singer Company, Debtor.**

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 27, 1993.

Harley E. Riedel, David B. Potter, Donald E. Engle, Robert H. Wheeler, for debtor.

William Goldman, for Unsecured Creditors' Committee.

## ORDER ON MOTION TO SELL AND COMPROMISE CONTROVERSY

ALEXANDER L. PASKAY, Chief Judge.

THE OLD adage that a bird in the hand is worth two in the bush frequently comes into play in the administration of estates in bankruptcy. This is particularly true when the matter under consideration is a proposed compromise of a controversy by the estate or a sale of an asset of the estate. Unfortunately, in the present instance, both of these are involved in the Motion filed by Bicoastal Corporation d/b/a Simuflite f/k/a The Singer Company (Debtor). The Debtor seeks approval of a compromise of pending litigation with Shinwa Company Limited (Shinwa), the successor-in-interest of Semi–Tech Microelectronics (Far East) Limited, and an assignment of the Debtor's right to receive royalty payments pursuant to a Royalty Agreement (Exh. # 1) executed by the Singer Company, the predecessor-in-interest of the Debtor, and Shinwa on May 26, 1989 involving the use of the Singer trademark.

The Motion under consideration is fully supported by all constituents of the Debtor, i.e. the Official Committee of Unsecured Creditors, the Singer Retirees Action Com-

mittee (SRAC), and senior secured lenders, but violently opposed by ownership interest, namely BPLP–1 (BPLP), the former owner of the common stock of the Debtor. BPLP–1 is a limited partnership in which Bicoastal Acquisition Corp. (BAC) is a general partner together with James Orr (Orr). Orr is the trustee of the estate of Paul A. Bilzerian (Bilzerian), the former CEO and Chairman of the Board of the Debtor, who is himself a debtor in his own Chapter 7 case currently pending before this Court. In order to put the issues in proper focus, a summary of the historical background, as it appears from the record, should be helpful.

### Historical Background

The Debtor's predecessor-in-interest is The Singer Company of New Jersey (Singer/NJ). On July 18, 1986, Singer/NJ entered into a Reorganization and Distribution Agreement with Singer Sewing Machine Company (SSMC). Under the Agreement, Singer/NJ transferred certain assets and business lines, including its sewing machine lines, to SSMC. In connection with the transfer, Singer/NJ granted SSMC a license (SSMC license) to use the Singer Mark in connection with the manufacture, sale and distribution of certain specified products. In essence, SSMC took over the business of manufacturing and distributing certain consumer goods, while Singer/NJ retained ownership and ultimate control over the Singer Mark. The SSMC License contained a number of important limitations on SSMC's right to use the Singer Mark. Subsequently, Singer/NJ merged with The Singer Company of Delaware (Singer/DE), and all the assets of Singer/NJ became the assets of Singer/DE.

In early 1989, Singer/DE and Shinwa began negotiations to purchase a controlling interest in SSMC, culminating in the purchase by Shinwa of approximately 77 percent of the stock of SSMC by April, 1989. SSMC continued to have limited rights to use the Singer Mark under the restricted SSMC License even after control of SSMC passed from the Singer/DE to Shinwa.

### The Royalty Agreement

In addition to control of SSMC, Shinwa sought full ownership of the Singer Mark, as opposed to a mere restricted license. The negotiations for ownership of the Singer Mark ultimately resulted in a Royalty Agreement dated May 26, 1989 between Singer/DE and Shinwa. Subsequently, Singer/DE changed its name to Bicoastal Corporation (Debtor). Immediately after execution of the Royalty Agreement, Singer/DE assigned its rights under the Royalty Agreement to its wholly-owned subsidiary, Singer Royalty Company (subsequently known as Bicoastal Royalty Corporation (BRC)). At the same time, Shinwa transferred title of the Singer Marks to Semi–Tech Microelectronics (overseas) Limited, now known as the Singer Company Limited, an Isle of Man corporation ("SCL").

Pursuant to the Royalty Agreement, the Singer/DE agreed to assign its entire right, title and interest in the Singer Mark to Shinwa, free and clear of any interest, including the interest of Singer/DE. In return, Shinwa agreed to pay a royalty to the Singer/DE, in perpetuity, of one and one-half percent of all "gross sales."

Shinwa's obligations to pay royalties to the Debtor commenced immediately upon the effective date of the Royalty Agreement, on April 15, 1989, and were payable 60 days after the end of each quarter. Since Shinwa's first quarter ended April 30, 1989 (Shinwa's fiscal year runs from February 1 to January 31 of each year), Shinwa's payment for the period from April 15, 1989 to April 30, 1989, was due on June 29, 1989 (sixty days from April 30, 1989). Based on the gross sales report furnished by Shinwa, Shinwa paid the Debtor 1.5% of the gross sales of $21,598,000.00 on June 30, 1989, or an amount of $323,970.00.

Although the second quarter royalty payment became due on September 29, 1989, Shinwa failed to make the payment required by the Royalty Agreement. In addition, Shinwa failed to make the royalty payments for the second and third quarters, and failed to provide the Debtor with the quarterly statements on gross sales required by the Royalty Agreement.

On November 10, 1989, the Debtor filed its Petition for Relief under Chapter 11 of the Bankruptcy Code. On January 30, 1990,

Shinwa filed a claim against Bicoastal for $100 million in damages claimed to have been suffered as a result of the Debtor's alleged breach of the Royalty Agreement by failing to record and register the Singer Mark in several countries. SSMC also filed a proof of claim for damages based upon an alleged breach of the Royalty Agreement by the Debtor.

### The Settlement Agreement & Subsequent Litigation

The Debtor, BRC, SSMC and Shinwa negotiated a settlement of the matters arising from the Royalty Agreement. On October 17, 1990, this Court entered an Order approving the Settlement Agreement. The Order obligated Shinwa to make royalty payments for the first quarter of fiscal year 1990 (February 1, 1990 through April 4, 1990), and required Shinwa to deliver to the Debtor and BRC a statement certified by accountants setting forth the amount of gross sales for the period April 15, 1989 up to and including January 31, 1990.

Despite the Court's Order which approved the settlement, Shinwa refused to deliver the required Gross Sales Certificate and payment required by the settlement. On December 17, 1990, Bicoastal filed an Objection to Shinwa's claim coupled with a counterclaim seeking an accounting, damages for the past due royalties and declaratory relief, which was assigned Adv. No. 90–709. On January 15, 1991 the Debtor filed a Motion and sought an Order finding Shinwa in contempt for failing to comply with the Court's Order which approved the settlement, and also sought imposition of sanctions. On March 1, 1991, Shinwa paid the Debtor $817,-875.47, claiming the sum represented the amount of royalties due for the first quarter of fiscal year 1991. However, Shinwa still did not, as ordered by the Court, provide the Debtor with the accounting of the gross sales required by the Royalty Agreement.

On July 15, 1991, this Court entered an Order directing Shinwa to prepare the 1991 Gross Sales Certificate and to provide the Certificate to the Debtor on or before July 30, 1991. In addition, the Court ordered Shinwa to provide to the Debtor future quarterly gross sales statements and Gross Sales Certificates. Shinwa failed to comply with this Order. On August 8, 1991, Shinwa moved to dismiss Bicoastal's counterclaim for lack of subject matter jurisdiction, which was denied by this Court.

In due course, the Objection and the Counterclaim were set for final evidentiary hearing, and tried. On June 3, 1992, this Court entered an Order disallowing Shinwa's claim and finding that Shinwa was liable to Bicoastal for unpaid royalties (Exh. # 21H). In its Opinion, this Court concluded that the Debtor did not breach the Royalty Agreement; that the Debtor had performed its obligations under the Royalty Agreement; that Shinwa had no justification for nonpayment of royalties and for its failure to prepare the accounting required by the Royalty Agreement.

The amount of damages due to the Debtor was subsequently determined by this Court on November 16, 1992. In its Findings of Fact, Conclusions of Law and Memorandum Opinion (Exh. # 21I), this Court found and concluded that Shinwa was liable to Bicoastal for unpaid royalties for the initial nine quarters in the amount of approximately $33 million, plus interest of approximately $9.8 million, with interest to accrue from November 18, 1992. Also, this Court required Shinwa to render a full accounting of gross sales pursuant to the Royalty Agreement. On December 4, 1992, this Court entered a final judgment for $45,179,000.00 (Judgment). On December 11, 1992, Shinwa filed their Notice of Appeal of the Judgment.

Bicoastal immediately commenced efforts to collect on the Judgment. These efforts included, but were not limited to, the following matters, which still remain pending in Courts throughout the world:

(1) A civil action to collect damages on account of unpaid royalties for the six quarters subsequent to this Court's initial final judgment filed in Tampa District Court;

(2) an action in Hong Kong seeking to domesticate this Court's judgment for the initial nine quarters;

(3) an action in Toronto, Canada, to domesticate the initial nine quarter judgment;

(4) proceedings in New York involving over 40 entities that have transacted business with Shinwa to domesticate and collect on the initial nine quarter judgment;

(5) an action in Hong Kong to wind up Shinwa;

(6) an action in Hong Kong to set aside transfers from Shinwa to its parent, Semi-Tech (Global) Company, Ltd., a Bermuda corporation; and

(7) an action in the United States District Court in Tampa against Shinwa and nine of its affiliates and directors seeking to impose successor liability upon them to recover fraudulent transfers, and to otherwise hold those parties responsible for payment of this Court's judgment, and other royalty obligations;

These collection efforts continued until January 29, 1993, when this Court granted a stay pending appeal after Shinwa posted a letter of credit in the amount of approximately $59.5 million to secure payment of the $45 million Judgment plus interest in the event the Debtor prevails on appeal.

On December 14, 1993, the Debtor filed a Motion seeking reimbursement for its attorneys fees and out-of-pocket expenses related to the royalties litigation. On April 6, 1993, this Court entered a Supplemental Final Judgment in the amount of $1.1 million for attorneys fees, out-of-pocket costs, and expenses. This Supplemental Final Judgment was also appealed by Shinwa on April 14, 1993. Finally, on June 18, 1993, this Court entered a second Supplemental Final Judgment in favor of the Debtor for royalties due on account of sales by Singer India and Singer Turkey. This Final Judgment was entered in the amount of approximately $3 million. Shinwa promptly filed its notice of appeal of this Judgment on June 25, 1993. In sum, the Debtor now holds Judgments in its favor, and against Shinwa totalling $49,-312,241.00.

## The Terms of the Confirmed Plan of Reorganization

The Debtor's Plan of Reorganization confirmed on September 14, 1992 provides for a systematic liquidation of the Debtor's assets, with the proceeds to be distributed to the creditors with allowed claims of the Debtor. The Plan contemplates a 100% dividend to creditors in classes 1 through 13 of the Plan. Of these classes, only creditors in class 9, the Singer retirees, and creditors in class 13, the general unsecured creditors of the Debtor, remain to be paid. These classes are entitled to receive payment in full of their allowed claims, together with interest, which is currently accruing at the rate of $25,000.00 per diem. So far, the Debtor has made four distributions and is currently seeking authority to make a fifth distribution.

Entities in Classes 15, 16 and 17 are holders of equity interests: Senior preferred stockholders; Junior preferred stockholders; and, common stockholders, respectively. The Plan provides that the common stock of the Debtor will be canceled, and new stock will be issued to a stock trust. Under the Plan, BPLP is a holder of common stock and is a forth-tier beneficiary of this stock trust. Of course, the equity security interests in Classes 15, 16 and 17 will not be paid until all claims under Classes 1 through 13 were paid in full, with interest.

The Order of Confirmation generally retained the jurisdiction of this Court for all purposes set forth in the confirmed Plan, and specifically retained jurisdiction related to any disputes arising under or related to the Royalty Agreement between the Debtor and Shinwa. Jurisdiction was also retained to approve any sale of assets of the Debtor, and to resolve claim disputes. With regard to the controversy currently under consideration, the confirmed Plan requires that Bicoastal seek and obtain this Court's approval of any compromise of the Shinwa litigation in the event that certain parties, including BPLP, file a written objection. The confirmation Order further states that the intended purpose of the retention of jurisdiction over the Shinwa controversy was "to confer upon this Court the broadest jurisdiction per-

missible by law with respect to the disputes described in the Plan."

### The Terms of the Proposed Compromise and Sale

Under the compromise, Bicoastal would receive $93.8 million in cash, subject to immediate payment; all pending litigation between the Debtor and Shinwa and its successors-in-interest throughout the world would be dismissed by the Debtor with prejudice; and the parties would exchange mutual releases. In addition, the Debtor is required to quit-claim to Shinwa remaining rights to the Singer Mark under the Royalty Agreement. Under the proposed compromise the Debtor would have a limited duty to cooperate in recording the Singer Mark for eighteen months following approval of the Compromise, but failure to cooperate would not subject it to money damages. The proposed Compromise would resolve all claims arising under the Royalty Agreement, including: this Court's three judgments representing amounts due for the first nine quarters under the Royalty Agreement; the litigation pending before the U.S. District Court where the Debtor is seeking a money judgment for the next six quarters under the Royalty Agreement; all claims the Debtor may have for future royalties; and all claims and litigation the Shinwa parties have against Bicoastal, including Shinwa's $100 million proof of claim.

### Objections to the Proposed Compromise and Sale

On June 18, 1993, Bicoastal filed a Motion with this Court seeking approval of the Compromise and the Sale. BPLP filed its objection to the Debtor's Motion. In addition, BAC and Bilzerian also filed objections to the Compromise and Sale.

In its objection, BPLP contends that: (1) this Court lacks subject matter jurisdiction because the Compromise represents a sale of substantially all of Bicoastal's assets; (2) the amount of the Compromise and Sale is significantly less than the value of the asset and, therefore, the Debtor should consider alternatives to the Compromise, namely foreclosure on the Singer Mark or marketing of its rights under the Royalty Agreement; and (3) Mesa, Inc., an entity which now controls the Debtor's Board of Directors and is also one of the major creditors of the Debtor, unduly influenced and pressured the management of the Debtor to accept the Compromise because the dividend it would receive would assist Mesa with its current financial difficulties. Based on these contentions, BPLP contends that the Compromise should not be tested under the business judgment rule because the Compromise is obviously motivated by the self-dealing of Mesa.

In response to the Objection, the Debtor contends that: (1) this Court has jurisdiction to consider the Motion simply because the Plan of Reorganization specifically reserved jurisdiction over the compromise of this litigation; (2) BAC, BPLP and Bilzerian do not have standing to object to the Compromise; and (3) the Compromise is reasonable and in the best interests of creditors considering not only the risk of the litigation, but also the collection costs of the Judgments if the Debtor prevails on appeal and any other judgments it might obtain in the future.

### Jurisdiction to Consider the Motion

■ The subject matter jurisdiction of this controversy before this Court is clearly a threshold issue to the resolution of this controversy, and therefore, shall be addressed first.

As noted earlier, the Objectors contend that this Court lacks jurisdiction to approve this Compromise and Sale because of the following: (1) the Compromise set forth by the Debtor is in reality a post-confirmation sale of substantially all the assets of the Debtor, and as such, approval should be sought from the Chancery Court of Delaware, the State of incorporation of the Debtor; and (2) the post-confirmation jurisdiction of the Bankruptcy Court should be construed in a narrow manner, and be limited only to those matters which are necessary for the successful consummation of the Plan, as that term is defined in § 1101(2)(A), (B) and (C) of the Bankruptcy Code.

In response, the Debtor points out that this Court specifically retained post-confirmation jurisdiction for a number of purposes including, but not limited to, enforcement of the Debtor's obligations under the Plan; to

resolve any adversary proceedings, including approval of proposed settlements; to approve any sale of assets by the Debtor, or to enter such orders as may be necessary to aid confirmation and to facilitate implementation of the Plan.

Although it is generally accepted that a Court's post-confirmation jurisdiction should be narrowly construed, substantial case law exists which provides a court with the ability to retain jurisdiction over specific matters. *In re Neptune World Wide Moving, Inc.,* 111 B.R. 457 (Bankr.S.D.N.Y.1990); *In re A.R.E. Manufacturing Company, Inc.,* 138 B.R. 996 (Bankr.M.D.Fla.1992); *In re Highway Equipment Company,* 120 B.R. 910 (Bankr. S.D.Ohio 1990); *In re Tri–L Corporation,* 65 B.R. 774 (Bankr.D.Utah 1986); *Prince v. Clare,* 67 B.R. 270 (N.D.Ill.1986).

This Court is satisfied that the Objectors' argument that this Sale is a sale of substantially all of the Debtor's assets is unsupported. It is clear that the disposition of the Singer Mark is an integral part of the implementation of the Plan of Reorganization, and the liquidation process of the assets of this Debtor, through which the Debtor's Plan of Reorganization is funded. Under the provisions of the Plan and the Order Confirming Plan, it is clear that this Court has specifically retained jurisdiction to resolve issues arising from the Royalty Agreement, and to approve the sale of assets of the Debtor. Based upon the foregoing, this Court is satisfied that approval of the Compromise and Sale is within the scope of this Court's jurisdiction, and is properly before the Court.

### Standing of BPLP, BAC, ORR and Bilzerian

█ It should be noted at the outset that BPLP holds an interest which is treated under Class 17 of the Debtor's Plan, albeit remotely. The interests of BPLP are remote not only in that Class 17 is the last class to receive distributions, and will only receive distributions after all classes occupying a senior position to BPLP have been paid in full, with interest, but also to the extent that BPLP is a fourth-tier beneficiary to the stock trust. Notwithstanding, BPLP is a party of interest whose interest is treated by the Confirmed Plan, and as such has standing to object to the Debtor's Compromise. Clearly, the right to notice under the Debtor's Plan of Reorganization is not determinative of a parties standing to object to a compromise.

█ It is equally clear, however, that neither BAC, nor Orr have standing to object to the proposed Compromise and Sale. First, the Confirmed Plan only provided for notice to BPLP and not to BAC, Orr or Bilzerian. Second, neither BAC nor Orr are creditors of the Debtor nor are they equity security holders, albeit they are general partners of BPLP. It is elementary that a limited partnership acts solely through its general partners. Therefore, to the extent that BAC and Orr act as representatives of BPLP, they have the right to be heard in their capacity as general partners of BPLP. However, in their individual capacities, they are not creditors of the Debtor, and therefore, have no standing to assert an objection to the Compromise and Sale.

█ The standing of Bilzerian to object to the proposed Compromise and Sale requires somewhat different consideration. Facially Mr. Bilzerian has an allowable unsecured claim albeit not in the amount it was asserted. However, after a full scale evidentiary, hearing this Court entered an Order and determined that the allowable claim of Bilzerian is less than the amount due and owing by Bilzerian to the estate. Applying the principals of set-off, it is appropriate to disregard Bilzerian as a creditor with an allowable claim. For this reason he equally has no standing to object to the proposed Compromise and Sale. This leaves for consideration the merits of the proposed Compromise.

### Sale of the Trademark

The primary thrust of attack of the Objectors is the sale of the income stream of the Singer Mark to Shinwa. The Objectors oppose the transfer of this mark because, they argue, the Sale is one of substantially all the assets of the Debtor, and the Sale is governed by § 363(m) of the Bankruptcy Code and Shinwa is not a good faith purchaser.

In all candor, it must be noted that this proposed Compromise must be recognized as both a compromise of a controversy and an

absolute assignment of a substantial asset of the Debtor, i.e. the income flow from the Royalty Agreement. However, it is clear that the assignment of the Debtor's right to receive royalty payments is inextricably interwoven with the Compromise and that the compromise of the litigation between the Debtor and Shinwa cannot stand by itself separate and apart from the assignment of the income stream. This is so because it should be evident that the assignment of the income stream from the Royalty Agreement provides the motivation of Shinwa to settle the royalty litigation. It is apparent that Shinwa would not pay millions of dollars to settle the litigation, and then be faced with additional litigation as the Debtor continued in its attempts to collect future royalty payments until the end of time. For the reasons stated, it is obvious that the compromise of litigation cannot be separated from the assignment of the right to receive royalty payments. This Court is satisfied that the Motion should be tested under the guidelines for approval of a compromise.

Notwithstanding, addressing the Objectors points, this Court is satisfied that this Sale is not one of substantially all the assets, for the reasons set forth above in the discussion of this Court's jurisdiction. Furthermore, it is clear that § 363(m) does not govern this Sale, as this is a post-petition Sale, conducted after the Debtor has been revested with its property. However, this Court declines to make a finding that Shinwa is a good faith purchaser, as this record does not support such a conclusion.

### Principle Governing Approval of Compromises

 It is generally recognized that the law favors compromise of disputes over litigation for litigation sake. *In re Blair*, 538 F.2d 849 (9th Cir.1976). In the bankruptcy context, the Bankruptcy Court has broad discretion to approve a compromise, *In re Charter Co.*, 72 B.R. 70 (Bankr.M.D.Fla. 1987), and it should do so unless the proposed settlement "falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir.1983), *cert. denied* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). In other words, the pro-

posed settlement should be approved unless it yields less than the lowest amount that the litigation could reasonably produce. *In re New Concept Housing, Inc.*, 951 F.2d 932 (8th Cir.1991). The Eleventh Circuit has enunciated certain factors which must be considered in determining whether to approve a compromise, which are:

(1) the probability of success in the litigation;

(2) the difficulties, if any, to be encountered in the matter of collection;

(3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir.1990), *cert. denied* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). In considering these factors, the court may take into account the "devastating effect" an adverse ruling would have upon the estate. *In re Holywell Corp.*, 93 B.R. 291 (Bankr.S.D.Fla. 1988). The debtor's ability to prevail on the underlying dispute will not prevent approval of the compromise if the court concludes that it is prudent to eliminate the risks of litigation to achieve certainty. *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567 (5th Cir.1960).

 Considering the proposed Compromise within the guidelines of the factors set forth in *Justice Oaks* by the Eleventh Circuit, the first factor for consideration is the probability of success in the litigation. In this regard, the record is clear that, although the Debtor prevailed on the litigation with Shinwa in this Court, the Debtor has substantial hurdles to overcome at the several appellate levels. It needs no elaborate discussion to point out that success at the trial level holds no guarantees for ultimate success at the appellate level. The evaluation of the prominent law firm of Holland & Knight indicates that there is substantial risk that some element of this Court's Judgments may be reversed on appeal. This evidence is unrebutted. In addition, it is clear that if the Compromise is not approved, the Debtor's ability to succeed in obtaining future Judg-

ments for royalties earned in subsequent quarters is difficult and expensive based only on past history of the Debtor's attempt to collect its Judgments against Shinwa, and force Shinwa to comply with the Debtor's demand for an accounting and the payment of royalties earned.

In addition, this Court must consider the collection efforts of the Debtor, and the success of the collection in considering the Compromise. As noted earlier, the Debtor has begun seven separate actions in courts all over the world in an effort to collect this Court's Judgment, and the subsequently accruing royalties. The total cost of this effort to date exceeds $4 million, with no real success in sight. BPLP, however contends that collections should be easy, in view of the guarantee given by Semi–Tech (Bermuda) of all of Shinwa's debts. Although the proposition is facially persuasive, upon further examination it should be apparent that to sue on the guarantee will first require domestication of the Judgments in Bermuda or possibly in the courts of the Isle of Man, and the commencement of a suit on the guarantee against Semi–Tech (Bermuda). In sum, it is beyond peradventure that collection attempts in foreign countries, i.e. Hong Kong, Isle of Man, Bermuda, would be a very expensive and difficult process.

The next factor for consideration is the complexity of the litigation. The litigation between the Debtor and Shinwa leading up to the entry of the Judgments against Shinwa was extremely complex, requiring three days of testimony, massive documentary evidence and, of course, post-trial briefs. In view of the substantial effort undertaken in trying this litigation before this Court, it is clear that subsequent litigation, including the appeals of this Court's Judgment, will require an equal amount of effort.

### What are the Alternatives?

If the Motion under consideration is granted, the Debtor will be able to make the fifth distribution without delay and satisfy in full all the remaining unpaid allowed claims, with the exception of the equity claims in Classes 15, 16 and 17. The alternative suggested by the Objectors, is to continue to litigate with Shinwa, not only on the appellate level, but also to collect royalty payments accruing in the future, holds a very doubtful and questionable value.

Contrary to the contention of the Objectors, it is doubtful that the right to receive payments under the Royalty Agreement is marketable at all and has measurable economic value to anyone other than Shinwa. This is so because, unless the prospective buyer is able to establish a worldwide chain of Singer stores selling Singer marked goods, the sale of which would establish the basis for future royalty payments, the Trademark is worthless.

As a final point, it is not unlikely that if the Motion is denied, Shinwa will walk away with its offer, leaving the Debtor with no choice but to pursue the multitude of entities spun off by Shinwa in the hope that one of them will be found to be responsible for royalty payments and the Debtor will be able to collect the royalty payments in the future pursuant to the Royalty Agreement.

### Adequacy of Consideration

It is the contention of the Objectors that the price offered for the Compromise and Sale, i.e. the assignment of the revenue to be derived from the Royalty Agreement, is inadequate and, therefore, this Court should not approve the Compromise.

It should be pointed out at the outset that the real value of intellectual property is its potential to generate income. In the present instance, the income stream to be derived pursuant to the Royalty Agreement is based on the use of the Singer Mark. Currently the Singer Mark is being used by Shinwa or its successors-in-interest in a wide-spread distribution system spread over three continents. In order to maintain the level of income generated by Shinwa, a subsequent purchaser of the Singer Mark would be required to setup and organize a similar marketing system by establishing retail establishments selling marked goods, absent of which the trademark would not produce any income to the purchaser. It is evident in this record that Shinwa has acquired the right to use the additional trademarks, including the PFAFF trademark, a trademark well-known in Europe, and Sansui, a recognized name in

the Far East. Should Shinwa be unable to obtain the absolute right to use the Singer Mark, it is not unlikely that it will reduce its use of the Singer Mark and increase its use of these other Marks, which it owns outright. In light of the foregoing, it is difficult to assume that the Debtor would be hard pressed to find a buyer to purchase the right to use the Singer mark.

This leads to the next question which is, in light of this record, what is really the fair value of the consideration offered for the proposed Compromise and Sale. As noted, the Judgment obtained by the Debtor against Shinwa is approximately $150 million. The price offered is $93.8 million and, facially might appear inadequate, especially when one takes into consideration the alternatives suggested by the Objectors. However, when placed in the proper perspective, this prices appears reasonable.

The Objectors' expert placed the value of the Compromise and Sale at $400 million. This expert gained his experience in the liquidation of assets in bankruptcy, and did not have any background or any meaningful experience evaluating the value of intellectual property. In reaching the value of the asset, the expert did not take into consideration the risks or costs of litigation in either the appeals or future collection of the royalty payments. Taking those items into consideration, the expert modified his value to at least $200 million. This number is totally arbitrary and unsubstantiated by this record.

In contrast, the experts presented by the Debtor in support of the proposed Compromise and Sale are a nationally recognized organization with extensive background and experience in evaluating intellectual properties, trademarks and licenses and a prominent law firm evaluating the likelihood of success on appeal. Balancing the opposing testimony of the experts, this Court is constrained to reject the testimony of the expert offered by the Objectors and is satisfied that the sum offered for the Compromise and Sale, $93.8 million immediate cash payment and waiver of any and all claims of Shinwa against the estate, is a fair and adequate consideration.

## CONCLUSION

In sum, this Court is satisfied that the best interests of creditors will be served in approving this Compromise. This Court is satisfied that the alternatives presented by the Objectors are tenuous and speculative at best, and cannot overcome the Debtor's showing of the benefits of this Compromise. For the reasons stated above, this Court finds that the Motion should be granted.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion to Compromise and Sell is hereby granted and the Compromise and Sale is hereby approved.

DONE AND ORDERED.